

FILED
COURT OF APPEALS DIV I
STATE OF WASHINGTON

2013 DEC 23 AM 9: 44

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 67776-4-I |
| Respondent, | ) ) | (consolidated with 69299-2-I) |
| v. | ) ) | DIVISION ONE |
| BRYCE NATHAN HUBER, | ) ) | |
| Appellant, | ) ) | |
| and | ) | UNPUBLISHED OPINION |
| BRANDON DOUGLAS CHANEY, | ) ) | FILED: December 23, 2013 |
| Defendant. | ) ) | |
| In the Matter of the Personal Restraint Petition of Bryce Nathan Huber. | ) ) ) | |
| STATE OF WASHINGTON, | ) ) | |
| Respondent, | ) ) | |
| v. | ) ) | |
| BRYCE NATHAN HUBER, | ) ) | |
| Petitioner. | ) ) | |

BECKER, J. — A jury found Bryce Huber guilty of first degree murder.

Huber claims his attorney, the late Anthony Savage, provided ineffective

assistance by foregoing lesser included offense instructions against Huber's wishes. But the record shows Savage made a strategic decision that was reasonable under the circumstances. Huber also contends that Savage was incapable of providing effective assistance because he was suffering from advanced cancer during trial. But the record shows that Savage, despite his illness, capably represented Huber. There are no factual issues about his representation that require an evidentiary hearing.

On the night of February 1, 2009, John Sylve and Danny O'Neal shot and killed Steve Bushaw outside a West Seattle restaurant and bar. The State charged Bryce Huber along with codefendants Sylve, Brandon Chaney, and O'Neal with premeditated first degree murder and conspiracy. The State's theory was that Huber and the other three men believed Bushaw had attacked a friend of theirs, and they planned and carried out Bushaw's murder to retaliate.

Sylve and O'Neal pleaded guilty to murder in the second degree with a firearm enhancement. The State tried Huber and Chaney together for first degree murder, with a firearm allegation. The cornerstone of the State's case was Sylve's testimony. The jury learned that the State agreed to recommend a sentence of 230 months for Sylve and that Sylve could receive time off for good behavior.

Chaney testified at the trial. Huber, represented by longtime defense attorney Anthony Savage, did not testify. The jury found Huber guilty as charged on August 29, 2011. The jury was unable to reach a verdict as to Chaney, and

2

the trial court declared a mistrial in his case.

The trial court sentenced Huber to 380 months, the top end of the standard range. At sentencing, the trial court noted Huber's "careful planning" in "setting up the execution of Mr. Bushaw." The court also remarked on Huber's "very callous disregard for the life of Mr. Bushaw."

Huber timely appealed his conviction and sentence. His direct appeal was stayed pending a CrR 7.8 motion for relief from judgment, filed on his behalf by the appellate attorney whom Savage entrusted with the case before he died.

Huber filed the CrR 7.8 motion on August 17, 2012. His motion asked the trial court to vacate his conviction and grant him a new trial due to newly discovered evidence and the alleged denial of counsel and ineffective assistance of counsel. See CrR 7.8(b)(2) ("Newly discovered evidence") and CrR 7.8(b)(5) ("Any other reason justifying relief"). A month later, the trial court transferred the motion here to be treated as a personal restraint petition, citing CrR 7.8(c)(2) and Toliver v. Olsen, 109 Wn.2d 607, 612-13, 746 P.2d 809 (1987).

Huber objected to the transfer. Our commissioner referred Huber's objection to a panel of judges for consideration without oral argument. Huber's attorney, who apparently understood that the objection to the transfer had been denied, moved to consolidate the personal restraint petition with the direct appeal. That motion was granted, and the stay on the direct appeal was lifted.

*Transfer of Motion for a New Trial*

As a threshold matter, Huber maintains his objection to the trial court's

3

decision to transfer his motion for a new trial to this court, to be treated as a personal restraint petition. He contends the trial court should have decided the motion because there are factual matters that need to be resolved in an evidentiary hearing.

The rules provide for transfer. Under CrR 7.8(c)(2), the trial court "shall transfer" the motion to the Court of Appeals for consideration as a personal restraint petition unless the court determines that the motion is not barred by RCW 10.73.090 and either the defendant has made a substantial showing he is entitled to relief or resolution of the motion will require a factual hearing. The court's decision was appropriate here because, contrary to Huber's argument discussed below, the record does not disclose material factual issues that require resolution through an evidentiary hearing.

*Ineffective Assistance of Counsel*

The facts material to Huber's claim of ineffective assistance are found in the trial record. Huber's friend, Sage Mitchell, was the victim of a home invasion robbery in January 2009. According to testimony at trial, Mitchell sold quarter-pounds of marijuana from his home. Two masked and armed men entered his home demanding money. As they searched, the men received instructions via telephone from a third person, who told them where to look for money. They beat Mitchell severely enough to send him to the hospital.

Huber's former roommate, Stephanie Cossalter, testified that Huber told her he thought "Steve" (Bushaw), Huber's coworker on the docks, had set up the

4

robbery. Huber had introduced Bushaw to Mitchell, reportedly for a drug deal, and Huber believed the men who robbed and beat Mitchell knew Mitchell had drugs and drug money. Cossalter testified that Huber said he could not let Bushaw get away with the attack and that Bushaw had to die as a result.

The night of the murder was February 1, 2009, Super Bowl Sunday. John Sylve met up with Mitchell, Chaney, and O'Neal, three acquaintances from his high school years in Yakima, and Lonshay Hampton, a man Sylve did not know. Sylve testified that the five men were at O'Neal's apartment when the conversation turned to the break-in at Mitchell's home. Hampton reportedly said he couldn't believe "they" would be allowed to get away with it. While no names were mentioned, Mitchell said he knew a guy (Huber) who thought he knew the person who was responsible for orchestrating the robbery and beating. Sylve testified that all the men agreed they should retaliate.

According to Sylve, Chaney made some phone calls to confirm they could get the man they were after (Bushaw) to the location where they intended to shoot him. Chaney reported that Mitchell's contact would call them to let them know when he could get Bushaw there. The group, minus Mitchell, left the apartment and drove to where they planned to shoot Bushaw. Sylve convinced Mitchell that he should not take part in the retaliation because police would immediately suspect him.

Cell phone records for that night showed conversations between Chaney and Huber, and between Huber and Bushaw. Huber was using a cell phone

belonging to a friend (Cara Anderson) to make calls.

Huber and two female friends, Anderson and Jennifer Razmus, drove to West Seattle in Razmus' car. In West Seattle, they met up with Mitchell's acquaintances outside a convenience store.

Sylve gave the following account of what happened next. Chaney and Huber discussed their plan. Huber asked whether they were really going to go through with it, and when Chaney said they were, Huber nixed Chaney's plan for a drive-by shooting. Huber explained that he was going to bring Bushaw outside Talarico's—the West Seattle restaurant and bar where he and Bushaw were meeting—and he did not want to be shot himself. Chaney assured Huber he would take care of things if Huber brought Bushaw outside. Huber and Chaney then got in their respective cars and drove to the restaurant.

Huber, along with Cara Anderson and Jennifer Razmus, met Bushaw at Talarico's. Anderson testified that after about 5 or 10 minutes, Huber and Bushaw went outside to smoke a cigarette.

Sylve said Huber and Bushaw remained in Bushaw's car for 15 minutes. When Bushaw got out of the car and began to cross the street, Sylve asked him for a light. As Bushaw hesitated, Sylve and O'Neal shot him at close range. Bushaw ran toward the restaurant and collapsed by the doorway. Bushaw later died at Harborview Medical Center.

Sylve testified that he and O'Neal ran back to the car where Chaney and Hampton were waiting. They immediately drove off. Huber eventually arrived

6

back at his Northgate condominium with Joy Vanderpool, another friend, in her car. The two women he left at Talarico's took a cab back to Razmus' condominium, where they spent the night. Huber dropped off Razmus' car there later that night.

Vanderpool testified that Huber told her that night that he and some others had "taken care of" a friend—shot him—but the person didn't die. The next day Huber left Seattle for the Tri-Cities to see Cossalter, his former roommate. Cossalter testified that Huber, upon arrival, told her "We took care of it." Huber told her he had met up with "Steve" for a beer and that as soon as he saw the car pull up, he told Steve they should go. The two left the restaurant, and "they popped him."

Brandon Chaney, Huber's codefendant for whom the jury could not reach a verdict, provided a different story from Sylve's as to what happened on the night of the murder. Chaney said there was no discussion about shooting or assaulting anyone. Chaney testified that he called Huber because he did not know where to go out in Seattle on a Sunday night and that Huber suggested the restaurant in West Seattle, where Huber wanted to question "Steve" about the home invasion robbery. Chaney insisted that he didn't know of any plan to shoot Bushaw.

*Direct Appeal*

In his direct appeal, Huber asserts he wanted the jury to be instructed on the lesser offenses of second degree murder (intentional murder without

7

premeditation) and first degree manslaughter. He contends Savage was ineffective (1) for acting against Huber's wishes and (2) for acting upon a misunderstanding of the facts and the law.

To prevail on a claim of ineffective assistance, Huber must show that (1) his attorney's representation was deficient and (2) Huber was prejudiced, meaning there is a reasonable probability that the result of the trial would have been different absent the challenged conduct. Strickland v. Washington, 466 U.S. 668, 687-88, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). An ineffective assistance claim is reviewed de novo because it presents mixed questions of law and fact. State v. A.N.J., 168 Wn.2d 91, 109, 225 P.3d 956 (2010).

Our Supreme Court examined the nature of the decision to forgo lesser included offense instructions in State v. Grier, 171 Wn.2d 17, 246 P.3d 1260 (2011), abrogating State v. Ward, 125 Wn. App. 243, 104 P.3d 670 (2004). "Part tactic, part objective, the decision to request or forgo lesser included offense instructions does not fall squarely within the defendant's sphere." Grier, 171 Wn.2d at 30. The court observed that the second edition of the ABA *Standards for Criminal Justice* stated, "'The defendant should be the one to decide whether to seek submission to the jury of lesser included offenses,'" but that language was not included in the third edition. Grier, 171 Wn.2d at 30. Under a "Strategy and Tactics" subheading of the commentary, the third edition notes, "'[i]t is also important in a jury trial for defense counsel to consult fully with the accused about any lesser included offenses the trial court may be willing to submit to the jury.'"

8

Grier, 171 Wn.2d at 31 (alteration in original), quoting ABA, *Standards for Criminal Justice: Prosecution Function and Defense Function* std. 4-5.2 cmt. (3d ed. 1993). The court concluded, "Washington's RPCs, as well as standards promulgated by the ABA, indicate that the decision to exclude or include lesser included offense instructions is a decision that requires input from both the defendant and her counsel but ultimately rests with defense counsel." Grier, 171 Wn.2d at 32.

Huber claims that if the defendant disagrees with defense counsel's decision and insists on a lesser included instruction, as Huber claims he did in his discussions with Savage, defense counsel is obliged to defer to his client's wishes. This is not the law. As stated in Grier, the decision ultimately rests with defense counsel.

Grier also defeats Huber's claim that Savage misunderstood the facts and the law. The decision to forgo an otherwise permissible instruction on a lesser included offense is not ineffective assistance if it can be characterized as part of a legitimate trial strategy to obtain an acquittal. Grier, 171 Wn.2d at 43; State v. Hassan, 151 Wn. App. 209, 218, 211 P.3d 441 (2009).

In Grier, the court held defense counsel was not ineffective for failing to request a manslaughter instruction for the murder defendant even though her case met the two-pronged test established in State v. Workman, 90 Wn.2d 443, 447-48, 584 P.2d 382 (1978). Under Workman, a defendant is entitled to a lesser included instruction if (1) each of the elements of the lesser crime is a

necessary element of the greater crime (the "legal prong") and (2) the evidence supports an inference that the defendant committed the lesser crime ("the factual prong"). Workman, 90 Wn.2d at 447-48. "The salient question" was not whether Grier was entitled to such instructions, but rather whether defense counsel was ineffective for pursuing "an all or nothing approach" to secure an acquittal. Grier, 171 Wn.2d at 42. The court concluded, "Grier and her defense counsel reasonably could have believed that an all or nothing strategy was the best approach to achieve an outright acquittal. . . .That this strategy ultimately proved unsuccessful is immaterial to an assessment of defense counsel's initial calculus; hindsight has no place in an effective assistance analysis." Grier, 171 Wn.2d at 43 (citation omitted). Nor could Grier establish prejudice under the second prong of Strickland. "Assuming, as this court must, that the jury would not have convicted Grier of second degree murder unless the State had met its burden of proof, the availability of a compromise verdict would not have changed the outcome of Grier's trial." Grier, 171 Wn.2d at 43-44.

Huber contends Savage had a mistaken belief that a lesser included instruction could not have been given because the State had presented evidence of premeditation. The record contradicts this claim. During a discussion of the jury instructions, the prosecutor pointed out that "neither defendant has submitted any lesser included instructions." The prosecutor asked, "I wonder if given recent case law it makes sense to have, in open court, . . . the defendants or their attorneys acknowledge that this is a strategic decision." Savage was aware that

a lesser included instruction could have been given despite the evidence of premeditation, but he believed the all-or-nothing approach was the better strategy:

> PROSECUTOR: I'm sorry, your Honor, but I think that -- I anticipated that someone later might claim that somehow they'd been deprived of the opportunity to seek a lesser included instruction.
>
> THE COURT: With these two counsel I don't -- never mind. My experience has been that these counsel are completely diligent, and they have made their decision as to how they would like to proceed. But if that's going to happen, please submit it to me.
>
> CHANEY'S ATTORNEY: I will, if it does happen. On the record, I've talked to my client about the issue that Mr. Baird's brought up, and it has been a --
>
> MR. SAVAGE: If I could.
>
> CHANEY'S ATTORNEY: No, I don't want to -- I don't want to say anything that screws up your case, but I'm not -- we're not submitting any, and that's a decision made after attorney and client referring. Is that correct?
>
> DEFENDANT CHANEY: Yes.
>
> MR. SAVAGE: Your Honor, I was probably being a little facetious. If the State's evidence is correct, I can't think of anything being more premeditated than planning to shoot this fellow in Renton and driving to West Seattle to do it.
>
> Now, I don't think that defense counsel should burden the court with facetious and unmeritorious arguments.
>
> THE COURT: That's sufficient for me, Mr. Savage, it really is. And it's just that all of us are struggling with what our appellate courts are deciding that are now a responsibility of judges sua sponte, as well as counsel, and I think that's where we're all trying to figure out where the case law would go.
>
> And I was not facetious when I said, with the two defense counsel in front of me, I know that they thoroughly go through what the instructions are and what they propose, and I was not going to make you undergo such a confirmation in front of me. I feel very awkward. There comes a point at which I cannot push beyond your consultation and representations of your client.
>
> MR. SAVAGE: For Mr. Huber's sake, I'm sure that he would like me to submit a lesser included.
>
> THE COURT: But you're thinking of the Workman case.[1]

---

[1] State v. Workman, 90 Wn.2d 443.

MR. SAVAGE: I'm thinking that it is unmeritorious and I'm obligated not to do that, and if some sharp shooter on appeal, if we get there, wants to take me to task, why that's been done before too. So I just -- there's not a lesser included, in my opinion, in this case.

As in Grier, Savage's decision to forego lesser included instructions was a legitimate trial strategy that cannot be second guessed based on hindsight. "'Where a lesser included offense instruction would weaken the defendant's claim of innocence, the failure to request a lesser included offense instruction is a reasonable strategy.'" State v. Breitung, 173 Wn.2d 393, 399-400, 267 P.3d 1012 (2011), quoting Hassan, 151 Wn. App. at 220.

Savage's strategy for Huber's defense was to focus on destroying Sylve's credibility. Savage grilled Sylve on the deal he made with the State, the inconsistencies between his previous statements (including his plea) and his testimony at trial, and whether he still thought he had the deal after his admission that he lied to police. He pressed Sylve: "Which is true, what you told the detectives or what you told the jury?" Sylve replied, "What I told the jury." Savage kept on: "You mean you lied to the detective in putting this deal together?" Sylvie responded, "Not lied, but was mistaken." Savage said, "Mistaken. I see." In closing argument, Savage told the jury, "the fundamental bedrock issue in this case, as far as Mr. Huber is concerned, is do you believe Mr. Sylve beyond a reasonable doubt?"

The evidence of premeditation against Huber was very strong, making his case similar to State v. Mullins, 158 Wn. App. 360, 372, 241 P.3d 456 (2010),

12

review denied, 171 Wn.2d 1006 (2011). In Mullins, the defendant was convicted of first degree murder, and we held that counsel was not ineffective for not requesting a jury instruction of second degree murder. If the defendant "had tried to argue that he was guilty at most of second degree murder, it would have weakened his claim of innocence." Mullins, 158 Wn. App. at 372. The same is true in Huber's case. Savage did not want to argue on the one hand that Sylve was lying about Huber's involvement in the planning and execution of the murder, and on the other hand that if Huber was involved, he committed some lesser crime because he acted without premeditation. Under the circumstances, Savage's strategy was reasonable.

We conclude Savage's refusal to request a lesser included instruction did not constitute ineffective assistance of counsel.

*Personal Restraint Petition*

In his personal restraint petition, Huber alleges Savage was ineffective in three additional ways: (1) for sleeping through portions of the trial, (2) for refusing to prepare and call Huber as a witness, and (3) for failing to prepare and investigate the case properly. Huber claims these alleged errors occurred because Savage was ill with cancer during the trial. He requests that his petition be sent back to the trial court for an evidentiary hearing on these allegations, which he contends are supported by his own declaration, two letters from Savage's oncologist, and a declaration from James Roe, the attorney who represented codefendant Chaney in the joint trial.

It is undisputed that Savage was suffering from esophageal cancer, the condition that led to his death more than four months after the trial ended. But the record is insufficient to create a factual issue about how Savage's illness affected his performance.

When a defendant's postconviction motion includes a claim of ineffective counsel, and the counsel in question cannot appear to explain or rebut the claim, "then the defendant should not, by uncorroborated allegations, be allowed to make a case for ineffectiveness." State v. Lukasik, 115 Wis.2d 134, 340 N.W.2d 62, 65 (1983). Huber's self-serving declaration claims that Savage was dozing off during trial. Nowhere in Roe's declaration does he accuse Savage of sleeping in court. The prosecutor noticed no such behavior. The oncologist's letters do not address Savage's condition *during* the trial.

The trial judge was in an excellent position to observe counsel during this lengthy trial. Before trial began in July 2011, the trial court had ordered a continuance to accommodate Savage's treatment, so the court was apprised of his illness. Yet there is no indication in the record of any question in the judge's mind about whether Savage was falling asleep during the proceedings or was too weak or distracted to be effective. The judge was well aware of the rule that permitted an evidentiary hearing to be held on Huber's motion for relief for judgment if there was any factual basis for it. Under CrR 7.8 (c)(2), the trial court "shall" transfer such a motion to the Court of Appeals for consideration as a personal restraint petition *unless* the court determines the defendant has made a

14

substantial showing that he is entitled to relief, or resolution of the motion will require a factual hearing. The fact that the trial court chose to transfer Huber's motion to this court rather than hold a hearing suggests that the court, having observed the trial, was not concerned that Savage's illness impaired his performance.

A review of the trial record shows that Savage was not only alert and prepared, but often masterful. He ably argued motions in limine (to the benefit of not just Huber, but Roe's client, Chaney); he was "real good in front of a jury" (Huber's own assessment of voir dire, as relayed in one of his phone calls from jail); on cross-examination, Savage showed Sylve up as a liar (to Huber's delight, as shown in the recorded calls); and in closing argument, Savage showed how Sylve's untrustworthiness created reasonable doubt.

In a motion to strike, Huber asks this court to strike appendices 2 and 3 to the State's response to his personal restraint petition. Appendix 2 is a Seattle Times obituary detailing Savage's respected career. The State claims it submitted the newspaper article simply as the most efficient means of establishing Savage's date of death in January 2012. We accept the submission for that purpose and disregard the remainder.

Appendix 3 is a sworn declaration Savage provided in March 2011 in a completely separate case in which he represented the defendant, Sione Lui. In the declaration, Savage explains his longtime practice of closing his eyes to concentrate:

I never "fell asleep" during the trial of this case. Given the layout of

15

the courtroom, if I were asleep it would have been in full view of the judge, lower bench, and prosecutors, none of whom raised a concern, which would have been apparent in the transcript of the trial. For the entirety of my career, I have at times closed my eyes during legal arguments. This blocks out visual distractions and allows me to listen and focus on the argument being made.

The State wants us to consider the declaration as a general response to Huber's claims because Savage is not alive to provide his own declaration.

Evidence rules do not apply to habeas corpus proceedings pursuant to ER 1101(c) (3). In re Pers. Restraint of Dyer, 143 Wn.2d 384, 394, 20 P.3d 907 (2001). Therefore, the hearsay rule does not necessarily bar us from considering Savage's declaration from the other case. Nevertheless, we grant Huber's motion to strike the declaration because it is related to a case tried years before Huber's trial began. Even without it, however, there is no need for an evidentiary hearing to determine the merits of the claim that Savage fell asleep.

As to Huber's contention that Savage advised him against testifying because Savage was "not prepared" to present his testimony, Huber offers no evidence that Savage improperly coerced him into remaining silent. Without such evidence, Huber is not entitled to an evidentiary hearing on this claim. See State v. Thomas, 128 Wn.2d 553, 561, 910 P.2d 475 (1996) (noting that a defendant must produce more than a bare, unsubstantiated, self-serving statement that his lawyer, in violation of professional standards, forbade him to take the stand).

Huber supports his claim that Savage was falling down on the job with an affidavit from James Roe, the attorney who represented Chaney, the

16

codefendant who did testify. But Chaney's decision to testify and the jury's inability to reach a verdict in Chaney's case do not weigh one way or the other with respect to Savage's performance because the evidence against Huber was stronger than the evidence against Chaney. Unlike Chaney, Huber was implicated not only by Sylve's testimony but by the testimony of the four women to whom Huber made incriminating statements before and after the murder. Given those numerous incriminating statements and Huber's recorded phone calls from jail, Savage likely kept Huber off the stand to avoid exposing him to a damaging cross-examination. This decision was consistent with Savage's overarching, and reasonable, strategy of creating reasonable doubt by calling Sylve's credibility into question.

In summary, the trial court properly concluded that Huber was not entitled to an evidentiary hearing. The existing record suffices to demonstrate that defense counsel effectively assisted his client.

We affirm the conviction and deny the personal restraint petition.

Becker, J.

WE CONCUR:

Leach, C.J.